UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

RECEIVED
USDC, CLERK GREENVILLE, SC
2017 MAR 10 PM 1:24

| | |
|---|---|
| John Doe, | Civil Action No. _:__-CV-____-___ |
| Plaintiff, | |
| v. | COMPLAINT **(Jury Trial Demanded)** |
| Doctors Care, P.A. | |
| Defendant. | |

### STATEMENT OF THE CASE

1.     This is an action against a large for-profit medical practice employing primary and urgent care physicians arising under Title III of the Americans with Disabilities Act and related state law claims. Plaintiff suffers from a common qualified disability that requires ongoing medical treatment. Plaintiff's condition does not require treatment by a specialist and is routinely treated by primary, urgent, and emergency care physicians.

2.     Plaintiff was a patient of the defendant medical practice and had received effective treatment for his disability. The practice adopted a policy that persons suffering from Plaintiff's specific disability could no longer be patients of the practice while continuing to hold itself out as providing primary and urgent care physician services.

3.     When Plaintiff appeared for treatment in December of 2014, Plaintiff was told he was no longer welcome to be a patient of the practice due to the new policy and was denied treatment, though Plaintiff had already paid for his treatment at that visit. Plaintiff has suffered serious short-term and long-term harm as a result of this denial of treatment.

4.     The facts of this case present a textbook example of a violation of the public accommodation provisions of Title III of the ADA by a medical practice defendant.

**PARTIES, JURISDICTION, AND VENUE**

5.      Plaintiff is a citizen of the State of South Carolina. Because this case relates to Plaintiff's medical treatment, Plaintiff seeks to proceed under the fictitious name of "John Doe" to protect his medical privacy rights.

6.      Plaintiff was diagnosed with adult attention deficit disorder in the late 2000's and has been continually diagnosed with the disorder at all times since, as the nature and severity of Plaintiff's symptoms has remained unchanged, as is typical for persons diagnosed with Plaintiff's condition.

7.      Plaintiff's symptoms are severe and entirely prevent Plaintiff from performing meaningful work and many important personal tasks without medication and additional reasonable accommodations. With access to medication and reasonable accommodations relating to employment matters, Plaintiff is capable of exceptional performance in his work. Plaintiff has historically employed a personal assistant to enable him to complete personal tasks that remain problematic for him even with his medication.

8.      The activity of working is expressly defined as a major life activity per the ADA Amendments Act of 2008, Pub. L. 110-325. Plaintiff, therefore, is a qualified individual with a disability within the meaning of 42 U.S.C. § 12131.

9.      Defendant Doctors Care, P.A. ("Doctors Care") is a business entity organized under the laws of the State of South Carolina. Upon information and belief, the principle place of business of Doctors Care is also within the State of South Carolina. The registered agent for Doctors Care currently listed with the South Carolina Secretary of State is C T Corporation System, 2 Office Park Court, Columbia, SC 29223.

10.     All acts and omissions of employees of Doctors Care described in this complaint

or otherwise relevant to this case were within the course and scope of such persons' employment with Doctors Care, and Doctors Care is vicariously liable for all such acts and omissions to whatever extent they are actionable.

11.     This action arises out of Plaintiff's dealings with employees of Doctors Care working out of the Doctors Care Seven Oaks medical office located at 100 Jimmy Love Lane, Columbia, South Carolina 29212.

12.     Plaintiff sought to become a patient of Doctors Care and was able to do so, but Plaintiff was unsuccessful in obtaining the medical treatment he requested and needed. Plaintiff contends Doctors Care had a duty under federal and state law to provide Plaintiff with such treatment on the facts of this case, but Doctors Care breached that duty when it refused to do so.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over the principle claim in this action because it arises under the public accommodation provisions of Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12181-12189, and its implementing regulation, 28 C.F.R. Part 36.

14.     Doctors Care is a proper defendant because it is a place of public accommodation pursuant to 28 C.F.R. § 36.104 with regard to this case, which arises out of a dispute between a patient and health care providers at the Doctors Care Seven Oaks medical office. Doctors Care Seven Oaks is a professional office of a health care provider, operated by a private entity, whose operations affect interstate commerce. Doctors Care is, therefore, as a place of public accommodation under 28 C.F.R. § 36.104 for the purposes of this action.

15.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the

remaining claims asserted in this action which arise under the statutory and common law of the State of South Carolina because such claims are so related to the principle claim that they form part of the same case or controversy under Article III of the United States Constitution.

16.    This Court may exercise personal jurisdiction pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution over Doctors Care upon proper service of process because this action arises out of Plaintiff's dealings with Doctors Care at a medical office operated by Doctors Care physically located in Lexington County, South Carolina.

17.    Venue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1441 because all acts and omissions of all parties relevant to this matter occurred within the District of South Carolina and Doctors Care is a citizen of the State of South Carolina.

18.    The Columbia Division is proper since most of the acts and omissions of the parties relevant to this matter occurred within Lexington County, a county within the Columbia Division.

## FACTS

19.    Plaintiff has always had difficulty concentrating for any period of time on tasks assigned to him, but because of Plaintiff's exceptional performance in academic settings, the problem was not apparent until Plaintiff finished school and entered the workforce.

20.    Plaintiff completed all primary and secondary school requirements at the age of 12, obtained a near-perfect score on the SAT, and started college at 15. Plaintiff triple-majored in hard sciences as an undergraduate, then obtained a doctorate in an entirely different professional field, consistently finishing near the top of his class at each

academic institution he attended.

21.     Plaintiff initially struggled mightily in employment settings, but a supervisor at his first job out of school suggested that Plaintiff's difficulties appeared to result from undiagnosed attention deficit disorder and suggested Plaintiff obtain an evaluation.

22.     Plaintiff went to his primary care physician for an evaluation, who diagnosed Plaintiff with attention deficit disorder. Plaintiff's primary care physician prescribed amphetamine as the only medical treatment but suggested Plaintiff also seek certain accommodations from his employer to avoid distractions while working.

23.     After trying different dosages over the course of a few months, Plaintiff' physician determined that the most effective treatment was a 20 milligram tablet of amphetamine salts twice daily.[1] This 40 milligram daily dose of amphetamine salts was a perfectly ordinary treatment for adult attention deficit disorder when Plaintiff was first diagnosed and continues to be today.

24.     Plaintiff's work performance improved dramatically due to the medication, as did his ability to perform personal tasks affected by his disability. With a few reasonable accommodations that his employer was happy to make, Plaintiff was able to perform his work satisfactorily and exceptionally. Plaintiff hired a personal assistant to assist with personal tasks that remained problematic despite the medication.

25.     Plaintiff's primary care physician retired from the practice of medicine sometime around 2010. Since that time, Plaintiff has had difficulty maintaining a consistent relationship with a primary care physician primarily due to changes in residence, changes in insurance, yet another physician retirement, inability to obtain timely appointments, and Plaintiff's work schedule conflicting with medical office hours.

---

[1] The most well known name-brand of this drug is Adderall.

26.    Whenever Plaintiff was in need of a new primary care physician, Plaintiff was usually able to find one before running out of his medication. The consistent practice of Plaintiff's primary care physicians has been to write Plaintiff prescriptions good for three months of medication at each office visit, which has usually afforded Plaintiff with ample time to find a new doctor if need be.

27.    Sometime in 2011,[2] Plaintiff's primary care physician went on an unexpectedly long vacation and was gone during the time Plaintiff needed his usual three-month refill for his medication.

28.    Plaintiff went to a Doctor's Care in Columbia, which at that time only employed urgent care physicians. Plaintiff saw an urgent care physician and explained that he had adult attention deficit disorder, that his current and previous primary care physician had always prescribed two 20 mg tablets of amphetamine twice daily as his treatment, that he was about to run out of medication and could not obtain more because his primary care physician was out on an extended vacation, and that this was care Plaintiff urgently needed due to the severity of his attention deficit disorder symptoms, inability to work or perform certain personal tasks without his medication, and the serious withdrawal symptoms[3] that Plaintiff would suffer if he ran out of medication.

29.    The Doctors Care urgent care physician wrote Plaintiff his prescription and told Plaintiff he was welcome to return to Doctors Care for his prescription in the future in

_____

[2] This may have occurred in 2010 or 2012.
[3] A patient taking 40 mg of amphetamine per day who quits "cold turkey" will usually suffer moderate to extreme fatigue to the point of being unable to stay awake for long periods of time and may suffer adverse psychiatric symptoms of varying severity that may or may not be related to the symptoms of whatever disorder the patient is taking the medication for. This can last for several days or several weeks. Plaintiff has run out of his medication on several occasions due to the pharmaceutical companies who manufacture the medication failing to make enough to meet demand. In each case, Plaintiff has suffered extreme fatigue, an enhancement of his attention deficit disorders symptoms to the point of total nonfunctionality, anxiety, depression, and other psychiatric symptoms. Plaintiff usually suffers noticeable withdrawal symptoms for about a week, with the withdrawal symptoms lessening throughout that time period.

any sort of similar situation where he was unable to obtain an appointment with his primary care physician because an attention deficit disorder patient who runs out of medication is unquestionably in an urgent care situation. Plaintiff told the doctor he would certainly do so if the need arose.

30.     Plaintiff moved in 2012 and changed primary care physicians to one closer to his new residence. Plaintiff's new primary care physician entirely concurred in the adult attention deficit disorder diagnosis and the medication regimen that all of Plaintiff's prior primary care physicians had agreed with.

31.     In late 2014, Plaintiff had a refill appointment scheduled but missed it due to an emergency at work, a not-uncommon occurrence in Plaintiff's line of work. Plaintiff contacted his primary care physician to reschedule and was informed that he was being terminated as a patient of the practice because he had failed to give notice that he would be unable to make the appointment more than 24 hours before the appointment, and the practice had just adopted a policy terminating relationships with patients under such circumstances.

32.     Plaintiff explained that his line of work often involved emergency situations that he had to address for which he did not get 24 hours notice, and therefore could not possibly provide 24 hours notice to his doctor's office in every situation where it was necessary for him to cancel an appointment. Plaintiff offered to pay full price for the missed appointment in order to remain a patient of the practice and to do so in the future should the situation recur. The doctor's office did not care and terminated Plaintiff as a patient.

33.     Though Plaintiff was almost out of medication, Plaintiff was not concerned

because Plaintiff reasonably believed that if he ran out of medication before he could obtain a refill appointment with his primary care physician, he would be able to go to Doctors Care in the meantime.

34.    Plaintiff believed this based on the prior representations of the urgent care physician at Doctors Care to the effect that Plaintiff could obtain treatment and prescriptions at Doctors Care in a situation where he was unexpectedly unable to obtain a timely re-fill appointment with his primary care physician. Plaintiff relied on that representation, and his reliance was entirely reasonable under the circumstances, since obviously Doctors Care would be able to contact his primary care physician's office to confirm that Plaintiff had tried to make a refill appointment and would eventually be able to do so, but could not at present due to the situation.

35.    Had Plaintiff had any idea Doctors Care might not be a solution, Plaintiff would have made extreme efforts to locate a new primary care physician immediately. Plaintiff's work obligations at that point in time were extreme, and Plaintiff would be in serious jeopardy from a work standpoint if he ran out of medication for any period of time.

36.    Plaintiff took his last two 20 mg amphetamine salt tablets on December 9, 2014 without having heard from his primary care physician's office manager.

37.    Plaintiff went online to locate the nearest Doctors Care, since he had moved a ways away from his prior residence. Plaintiff lived in the Harbison area in Columbia and the Doctors Care Seven Oaks location was most convenient.

38.    Plaintiff found this on the Doctors Care website and also found something that he did not expect. Doctors Care advertised that the medical practice had expanded to include

primary care physicians in addition to urgent care physicians and that their primary care physicians were accepting new patients.

39.    Plaintiff was concerned that the missed-appointment nonsense with his current primary care physician would repeat given the often-emergency nature of his work and frustrated by the bureaucratic idiocy of not letting Plaintiff simply pay full price for any appointments that he might miss. Plaintiff decided to try to become a primary care patient at Doctors Care and simply go there for his attention deficit disorder prescription from then on.

40.    Plaintiff telephoned the Doctors Care Seven Oaks location in Columbia, South Carolina and enquired if a primary care physician operated out of that location and, if so, whether the physician was taking new patients. Plaintiff was advised that Dr. Jawahar Swaminathan was a primary care physician operating out of the Doctors Care Seven Oaks location and he was, in fact, taking new patients.

41.    On December 9, 2014, Plaintiff traveled to the Doctors Care Seven Oaks location to see Dr. Swaminathan for the purpose of obtaining his treatment for his attention deficit disorder. Plaintiff expected Dr. Swaminathan would concur with all his previous physicians (including a Doctors Care urgent care physician) as to the diagnosis and treatment and write Plaintiff's usual prescription.

42.    Upon arriving at Doctors Care, Plaintiff expressed his intention to become a patient for primary care physician services from Dr. Swaminathan. Doctors Care informed Plaintiff that he needed to fill out the new-patient paperwork and pay an up-front $125 fee. Doctors Care represented to Plaintiff that after he had completed these two tasks, he would be examined by Dr. Swaminathan and, assuming Dr. Swaminathan

concurred with his previous primary care physician's diagnoses, Plaintiff would be able to obtain his ordinary treatment unless Dr. Swaminathan believed a different treatment was more medically appropriate.

43.    Plaintiff filled out the new-patient paperwork and tendered the $125 fee which was accepted by Doctors Care.

44.    Plaintiff was then taken to an examination room by a Doctors Care nurse. The nurse began a standard primary care examination of Plaintiff, which included asking Plaintiff about his medical history and what complaints he sought treatment for.

45.    Plaintiff told the nurse about his attention deficit disorder diagnosis that all of his previous primary care physicians had made, mentioned that the diagnosis had been concurred with by a Doctors Care urgent care physician at a different Doctors Care location, that all of these physicians had determined that the appropriate treatment was two 20 milligram doses of amphetamine each day, and that Plaintiff was entirely satisfied with his treatment and preferred to continue without change.

46.    The nurse told Plaintiff that Doctors Care had a policy against treating attention deficit disorder patients who required prescriptions of amphetamine salts[4] and that Plaintiff would not be able to see Dr. Swaminathan and would have to go to a different primary care physician for treatment.

47.    Plaintiff asked the nurse if Dr. Swaminathan also provided urgent care and whether that policy applied to persons with attention deficit disorder seeking urgent care

---

[4] Plaintiff does not know if this is the entire extent of the policy or, with one exception, if it extends to patients with other complaints that are treated by amphetamine (such as narcoleptics) or to other controlled substances in addition to amphetamine. Plaintiff was told only that the policy barred attention deficit disorder patients in need of amphetamine prescriptions from being patients at Doctors Care and, as explained below, that it also applies to persons going through amphetamine withdrawal from obtaining amphetamine prescriptions as a tapering strategy to avoid withdrawal symptoms.

due to running out of medication and being unable to obtain an appointment with their usual primary care physician.

48.    The nurse indicate that Dr. Swaminathan also provided urgent care and that the policy against treating attention deficit disorder patients seeking amphetamine prescriptions applied to all physicians at Doctors Care, including urgent care physicians and primary care physicians.

49.    Plaintiff mentioned his previous visit with a Doctors Care urgent care physician and described in detail what happened during that visit and that the physician had told Plaintiff to return if he was in a situation where he was unable to obtain a prescription refill from his ordinary physician.

50.    Plaintiff asked the nurse to reconcile that with this policy, and the nurse indicated that the policy was new and that it Plaintiff had obtained his prescription from the urgent care physician prior to the policy being in place.

51.    Plaintiff asked the nurse if there was any way to accommodate him on that single occasion since he had obviously obtained that prescription at Doctors Care before, had relied on the urgent care physician's representation that he could return if need be, and had been given absolutely no notice of this policy. Plaintiff explained to the nurse that it would likely take him some time to obtain an appointment with a different primary care physician, that he had just taken his last of the medication and had no more, and that he would suffer extreme problems with work and serious withdrawal symptoms if he was not able to obtain a prescription during his visit.

52.    Plaintiff also invited the nurse to contact the office of his primary care physician to confirm that Plaintiff had a legitimate prescription that could not be timely refilled due

to the issues relating to Plaintiff missing an appointment so as to confirm Plaintiff was not engaged in any sort of "doctor shopping," and Plaintiff offered to execute a HIPAA release so that Doctors Care could obtain all of Plaintiff's medical records from all of his previous medical providers.

53.   The nurse indicated that the policy simply had no exceptions and that she was sorry Plaintiff was being inconvenienced by it but there was nothing that could be done and that Plaintiff would have to go to a different primary care physician for treatment for his attention deficit disorder. The nurse also indicated that she believed Plaintiff was not "doctor shopping" but that the policy had no exceptions.

54.   Plaintiff explained that he had already tendered $125 for a primary care physician visit because Doctors Care demanded he give up front payment and that Doctors Care had accepted his tender. Therefore, Doctors Care was contractually obligated to provide him with an examination by a primary care physician, diagnosis of any conditions within the realm of primary care, and any and all prescriptions that the primary care physician thought were medically appropriate and necessary to treat any diagnosed conditions.

55.   Plaintiff explained that since he had already paid full price for a primary care physician examination without any notice that the primary care he needed was prohibited by a Doctors Care policy, the policy was not a term of his contract with Doctors Care. Therefore, Dr. Swaminathan was legally obligated to provide Plaintiff with an ordinary primary care physician examination without excluding any diagnosis due to a policy of Doctors Care. If Dr. Swaminathan found during this examination that Plaintiff had attention deficit disorder, Dr. Swaminathan had a duty to inform Plaintiff of all treatment options that would be medically appropriate based solely on Dr. Swaminathan best

medical judgment and not on any policy of Doctors Care, and to provide Plaintiff with the pros and cons of each treatment option so that Plaintiff could make an informed choice in the matter. Dr. Swaminathan then had a duty to write Plaintiff all prescriptions necessary for which treatment option Plaintiff chose even if a policy of Doctors Care prohibited it.

56.    Plaintiff explained that if Dr. Swaminathan would not write a prescription for amphetamine for whatever reason, then Plaintiff had an additional medical complaint, which was that he had taken 40 mg of amphetamine that day pursuant to a lawful prescription and every day prior for many months and that he would experience extreme withdrawal symptoms if Dr. Swaminathan decided not to continue the amphetamine prescription for attention deficit disorder. Plaintiff gave the nurse his empty prescription bottle showing that his last prescription was a 30 day supply of 60 20 mg tablets of amphetamine filled on November 10, 2014 which had run out that day, December 9, 2014, prior to Plaintiff's visit to Doctors Care.

57.    Plaintiff explained that his complaint regarding amphetamine withdrawal was indisputable as a diagnosis under the circumstances and that Dr. Swaminathan therefore had a duty to tell Plaintiff about all treatment options for amphetamine withdrawal, the pros and cons of each, and write any prescriptions necessary based on the option Plaintiff selected.

58.    Plaintiff explained that his particular complaint of amphetamine withdrawal was within the realm of primary care because it strictly due to the fact that his new primary care physician, Dr. Swaminathan, was terminating a prescription that he was given by his previous primary care physician and not because Plaintiff was some illegal drug user

addicted to amphetamines.

59.     Plaintiff explained that the amphetamine withdrawal issue was also within the realm of urgent care under the circumstances, since Plaintiff had run out of his medication that would cause withdrawal symptoms mere hours before and withdrawal symptoms would set in as soon as Plaintiff missed his next regular dose the next morning.

60.     Plaintiff explained that if a tapered dosage of amphetamine were a medically proper treatment for amphetamine withdrawal, then Dr. Swaminathan had to tell Plaintiff that and write a prescription accordingly if Plaintiff selected that as his treatment, or to write whatever prescriptions were necessary for a different treatment option if Plaintiff selected that instead.

61.     Plaintiff explained that he would be greatly harmed if he went into amphetamine withdrawal and went without medication to treat his attention deficit disorder, whether amphetamine or something else, due to work and personal obligations and tasks he had to complete over the coming days that he simply could not fulfill without medication, particularly not while suffering amphetamine withdrawal symptoms and the danger of "cold turkey" cessation of amphetamine salts.

62.     Plaintiff and the nurse discussed other matters in addition to the foregoing, and Plaintiff asked the nurse if she understood everything he had said, and the nurse affirmed that she did.[5] Plaintiff asked if any of that would make a difference with respect to the

-------------------

[5] Plaintiff is not a medical doctor but is qualifiable as an expert witness with regard to the particular aspects of the practice of medicine that are relevant to this case. They are extremely basic and probably all within the realm of common knowledge. Many are just simple contract law moreso than anything unique to the practice of medicine. When a primary care physician charges a patient in advance for an office visit, the primary care physician has a contractual duty to perform a primary care examination that meets the standard of care, diagnose any conditions discovered during the examination, provide the patient with all legal treatment options that would be appropriate within the physician's medical judgment, give the patient information about the pros and cons of each treatment option sufficient for the patient to make an informed decision, and write all prescriptions necessary for the treatment option chosen by the patient. A primary

policy such that Plaintiff would be able to obtain treatment for his attention deficit disorder and, if necessary, amphetamine withdrawal. The nurse stated that she would discuss the matter with Dr. Swaminathan and left the examination room, presumably for that purpose.

63.     The nurse returned and advised that Plaintiff could not be treated for either attention deficit disorder or amphetamine withdrawal at Doctors Care. Plaintiff asked why he could not receive a different medication for attention deficit disorder, but the nurse declined to address the situation further.

64.     The nurse told Plaintiff that he could be treated for any conditions or complaints he had aside from attention deficit disorder or amphetamine withdrawal, but that he would have to seek treatment from a different primary care physician for those complaints. Plaintiff asked if he could speak to Dr. Swaminathan about the matter, but the nurse told him he could not do so unless he wanted to be examined for something other than attention deficit disorder or amphetamine withdrawal. Plaintiff said that those were the only two topics he wished to speak to Dr. Swaminathan about, and the nurse

---

care physician can only decline to do this in a situation where the diagnosis or the treatment recommendation is outside the realm of primary care, in which case the patient must be referred to a specialist and given all details necessary for the patient to make an informed decision as to the specialist chosen. Plaintiff's attention deficit disorder was obviously diagnosable by a primary care physician without recourse to a specialist because numerous primary care physicians and one urgent care physician diagnosed it. Amphetamine are a perfectly ordinary prescription for adult attention deficit disorder and Plaintiff had taken the prescription without incident for a number of years when he presented as a patient at Doctors Care on December 9, 2014. Even if Dr. Swaminathan prefers treating attention deficit disorder with other drugs, as some doctors do, it does not matter what Dr. Swaminathan prefers. Dr. Swaminathan had a medical duty to present Plaintiff with all medically valid treatment options, explain the pros and cons of each to Plaintiff, and permit Plaintiff to select which he preferred. Dr. Swaminathan is welcome to prefer Ritalin or Concernta to treat attention deficit disorder, and he is welcome to explain his reasons for such preference to Plaintiff (and Plaintiff would certainly listen to them), but Dr. Swaminathan is not welcome to force his view on Plaintiff should Plaintiff chose a treatment option that Dr. Swaminathan does not prefer but that is medically appropriate. Plaintiff prefers amphetamine, amphetamine are a perfectly ordinary and common prescription for Plaintiff's diagnosis, and there is no medical reason specific to Plaintiff why he should not take amphetamine. These are basic principles of informed consent, and it is astounding that Doctors Care apparently has no understanding whatsoever of them.

reiterated that Plaintiff could not address those matters with Dr. Swaminathan.

65.     Plaintiff told the nurse that he had paid $125 up-front to be treated by a primary care physician for treatment of complaints clearly within the ambit of primary care but was not even permitted to speak to a doctor about his complaints. Plaintiff told the nurse that Doctors Care was in breach of contract. The nurse told Plaintiff his money would be refunded, and it was. Plaintiff left the Doctors Care Seven Oaks office.

66.     At no point during this visit did Plaintiff speak to or even see Dr. Swaminathan or any other person licensed to practice medicine.

67.     Plaintiff suffered severe withdrawal symptoms the next day and his attention deficit disorder symptoms returned in full force, causing him severe problems with both work and personal matters.

68.     Plaintiff looked for a primary care physician but could not find one able to see him in anything approaching a short period of time. Plaintiff considered going to the emergency room but did not wish to do so due to the extreme cost and likely financial problems it would cause for Plaintiff. Plaintiff eventually decided to go to the emergency room, however, and an emergency room physician conducted an examination of him, fully concurred in the diagnosis of adult attention deficit disorder made by every doctor who had ever examined him as an adult, and wrote the same prescription that every doctor who had ever prescribed medication for the condition wrote: 40 mg of amphetamine per day, taken as two 20 mg tablets.

69.     Before Plaintiff had heard from his primary care physician who had briefly fired him as a patient, Plaintiff found another primary care physician who, yet again, diagnosed Plaintiff with attention deficit disorder and wrote him his customary prescription.

70.    Plaintiff went to that physician until Plaintiff was unable to see that primary care physician any longer. Since that time, Plaintiff has been unable to locate a primary care physician and unable to return to Doctors Care to see an urgent care physician. Plaintiff cannot afford to go to the emergency room each time he needs a refill on his medication.

71.    The reason Plaintiff has been unable to locate a new primary care physician is that a great many of them have now adopted policies like Doctors Cares policy and refuse to enter into doctor-patient relationships with persons suffering from attention deficit disorder whose treatment involves amphetamine prescriptions. Some policies are directed strictly at amphetamine, while others involve all controlled substances prescriptions.

72.    Plaintiff has suffered numerous adverse consequences professionally and personally as a result of these matters. At this point in time, Plaintiff has not worked for over a year, and Plaintiff has suffered numerous extreme consequences. Plaintiff has become enmeshed in a number of legal and financial disputes as a result of his inability to perform various tasks that he could easily perform if he had access to medication.

73.    Plaintiff's life is essentially falling apart around him due to his impaired functionality in the absence of medication, and that in itself has caused Plaintiff extreme mental anguish, anxiety, and depression. There is a medicine on the market that effectively treats Plaintiff, and it is indisputably within the standard of care for primary care physicians to prescribe that medicine to Plaintiff and other patients like Plaintiff. Plaintiff cannot be denied access to the medically proper treatment for his disability because doctors have policies against prescribing such medicines that are categorical and not based on an individualized determination of patients' specific needs.

## FOR THE FIRST CAUSE OF ACTION
### DISABILITY DISCRIMINATION IN VIOLATION OF TITLE III OF THE ADA

74.    This is a clear case of disability discrimination in violation of the public accommodation provisions Title III of the Americans with Disabilities Act.

75.    Doctors Care is a for-profit medical provider that holds itself out as being open to the general public and offering the services of primary care physicians[6] and urgent care physicians and is a place of public accommodation for the purposes of this case.

76.    Plaintiff entered into a doctor-patient relationship with Doctors Care with respect to treatment of his disability for treatment on an urgent care basis and, later, also on a primary care basis. Plaintiff was, in fact, treated by a Doctors Care urgent care physician for his disability and effectively so.

77.    At all times relevant to this matter, the standard of care in South Carolina has been that Plaintiff's disability may be diagnosed and treated by any physician that treats general ailments, including pediatricians, primary care physicians, urgent care physicians, emergency care physicians, and that Plaintiff's disability is not one that requires referral to a specialist.[7] As a practical matter, Plaintiff's disability is usually treated by pediatricians and primary care physicians in South Carolina.

78.    Despite this, Defendant terminated its doctor-patient relationship with Plaintiff and refused to treat Plaintiff due to his disability, a blatant violation of Title III of the Americans with Disabilities Act.

---

[6] It appears Doctors Care no longer advertises the availability of primary care physicians at its locations. Plaintiff does not know whether Doctors Care no longer offers primary care physicians or simply no longer advertises that service. It is not particularly important to this case, since this action arose at a time when Doctors Care advertised the availability of primary care physicians and accepted Plaintiff as a primary care patient before unilaterally terminating the doctor-patient relationship on account of Plaintiff's disability.
[7] Many insurance companies require referral to a specialist for diagnosis of attention deficit disorder. Obviously, insurance companies cannot determine the standard of care for medical practitioners, and Plaintiff has never been subject to such a requirement by any of his health insurance companies and was not subject to such a requirement on December 9, 2014.

79.     Plaintiff seeks all recoveries available as a result of Defendant's illegal conduct.

## FOR THE SECOND CAUSE OF ACTION
### BREACH OF CONTRACT

1.     Plaintiff and Defendant formed a contract for the provision of primary care physician medical services.

2.     Plaintiff fully performed his obligations under the contract by paying Defendant $125 up front, prior to the provision of any medical services.

3.     Defendant then had a contractual obligation to perform a standard examination of Plaintiff as primary care physicians and prescribe him medication as needed to treat his medical conditions.

4.     Doctors Care then refused to perform their contractual obligations to Plaintiff, breaching the contract with Plaintiff.

5.     Given the urgency of Plaintiff's need for his medication and the potential for damage to his personal and professional obligations if he could not obtain a refill, Plaintiff had no choice but to find another physician to write a prescription for his medication.

6.     The only physician Plaintiff could locate soon enough to avoid damage to his business was an emergency room physician at Lexington Medical Center.

7.     Plaintiff ended up being billed $1,924 for a service that Defendant was contractually obligated to provide for $125. As a result, Plaintiff paid $1,799 more than he would have had to if Defendant had not breached the contract.

80.     $1,799 is the proper measure of damages for Plaintiff's breach of contract claim, and Plaintiff seeks a recovery of that amount on this cause of action.

## FOR THE THIRD CAUSE OF ACTION
UNFAIR TRADE PRACTICES

81.    Defendant holds itself out in advertising as offering services as primary care physicians.

82.    At all times relevant to this matter, the "About Us" page on Defendant's website stated the following:

### About Us

We are committed to our patients' health and well-being. "We Care" is our highest mission.

Doctors Care is staffed by experienced, dedicated and compassionate medical professionals. From the start, we have focused on delivering exceptional care, with an uncompromising commitment to our patients.

Doctors Care opened in 1981 as the first minor emergency medical center in Columbia, SC, offering urgent and primary care services with flexible evening and weekend hours.  Today we are a multi-state network, with over 50 offices providing health care services to meet our patients' needs in a timely and convenient manner.  Our team has grown to include 1,100 dedicated health care professionals, with over 230 providers focused on primary care, urgent care, occupational medicine and employee wellness. Doctors Care saw 790,000 patient encounters in the last year alone.  We serve over 2,500 employers regionally through our Occupational Medicine services.

All Doctors Care facilities have achieved the prestigious designation of Certified Urgent Care Clinics. The Urgent Care Association of America, a group representing more than 3,200 medical professionals, bestowed Doctors Care with the designation after a stringent review of its clinics in South Carolina and Tennessee. The designation is a promise to patients that they can turn to Doctors Care to treat a range of illnesses and injuries and that they'll be able to find services such as X-rays and laboratory work on site. This places our clinics among only a fraction of such facilities in the nation to be recognized for the range and quality of services offered.

83.    At all times relevant to this matter, the "Selling Your Practice" page on Defendant's website stated the following:

**Selling Your Practice**

If you are considering selling your practice, we want to know how we can work together. We share your entrepreneurial spirit and a desire to deliver outstanding patient care with exceptional administrative support to our providers. We recognize that financial success, independent decision making, and stability are critical factors. We do not have the restrictions or requirements of hospitals and franchise chains. We provide you with operations support and capabilities of a large company, while maintaining your personal and local connection to patients. We are growing rapidly and are financially strong.

When the time is right, we hope you will consider us.

84.    These particular pages on the Doctor's Care website induced Plaintiff to seek a primary care physician relationship with Doctor's Care.

85.    Plaintiff knew that Doctor's Care provided urgent care services (and had used those services before) but was not certain if Doctor's Care offered services as primary care physicians as he was searching for one.

86.    Plaintiff visited the Doctor's Care website, found the "About Us" page, determined that Doctor's Care offered services as primary care physicians.

87.    Plaintiff also saw the "Selling Your Practice" page, indicating that Doctor's Care is actively purchasing medical practices of primary care physicians.

88.    Nothing on the Doctor's Care website (at least, nothing that Plaintiff has been able to locate) indicates that Doctor's Care discriminates against patients with certain medical conditions with regard to the provision of primary care physician services.

83.    Plaintiff went to Doctor's Care because of the representations on the Doctor's Care website that Doctor's Care provides primary care physician services.

84.    Doctor's Care's advertising was false, however, as explained above, and Plaintiff seeks all recoveries available under the South Carolina Unfair Trade Practices Act

accordingly.

## PRAYER FOR RELIEF

Wherefore, having fully pled, Plaintiff John Doe respectfully requests the Court grant judgment in Plaintiff's favor and award all relief sought above, including but not limited to:

a.   All actual damages available under the causes of action pleaded above.

b.   All punitive damages available under the causes of action pleaded above.

c.   All treble damages available under the causes of action pleaded above.

d.   All other recoveries available under the causes of action pleaded above, including but not limited to pre- and post-judgment interest, costs, and attorneys fees and other litigation fees incurred by Plaintiff in this action.

e.   All available equitable relief.

f.   Such other relief as justice may require.

Respectfully submitted,

JOHN DOE
PLAINTIFF PRO SE
214 Jones Avenue
Simpsonville, SC 29681

March 9, 2017